# Application of the Government Corporation Control Act and the Miscellaneous Receipts Act to the Canadian Softwood Lumber Settlement Agreement

An aspect of the proposed agreement between the United States and Canada settling various disputes regarding trade in softwood lumber products, in which duties now held by the United States would be distributed by a private foundation to "meritorious initiatives" related to, among other things, timber-reliant communities, would not violate the Government Corporation Control Act or the Miscellaneous Receipts Act.

August 22, 2006

MEMORANDUM OPINION FOR THE GENERAL COUNSEL
UNITED STATES TRADE REPRESENTATIVE

The United States and Canada have negotiated an agreement settling various disputes regarding trade in softwood lumber products. You have asked whether one aspect of the proposed settlement, in which duties now held by the United States would be distributed by a private foundation to "meritorious initiatives" related to, among other things, timber-reliant communities, would violate the Government Corporation Control Act, 31 U.S.C. § 9102 (2000), or the Miscellaneous Receipts Act, *id*. § 3302(b). We conclude that this aspect of the settlement would not violate either statute. We express no opinion on other features of the settlement agreement.

## I.

One of the disputes regarding trade in softwood lumber products involves the "Byrd Amendment" to title VII of the Tariff Act of 1930. *See* Continued Dumping and Subsidy Offset Act of 2000, Pub. L. No. 106-387, § 1003, 114 Stat. 1549, 1549A-73 (2000) (codified at 19 U.S.C. § 1675c (2000)). That Amendment requires the Commissioner of the United States Bureau of Customs and Border Protection ("Customs") to deposit into "special accounts" in the United States Treasury "all antidumping and countervailing duties (including interest earned on such duties) that are assessed after the effective date [of the statute]" under antidumping or countervailing duty orders entered by the Commissioner. *Id*. § 1675c(e). Customs must annually distribute the duties in these special accounts to "affected domestic producers" as a "continued dumping and subsidy offset." *Id*. § 1675c(a).[1]

---

[1] Congress repealed the Byrd Amendment in the Deficit Reduction Act of 2005 but provided that "[a]ll duties on entries of goods made and filed before October 1, 2007, that would, but for [the repeal,] be distributed under [the Byrd Amendment] shall be distributed as if [the Byrd Amendment] had not been repealed." Pub. L. No. 109-171, § 7601(b), 120 Stat. 4, 154 (2006).

Several producers and exporters of softwood lumber products ("Canadian Producers") have challenged in the United States Court of International Trade the application of the Byrd Amendment to goods imported into the United States from Canada. The Canadian Producers have argued that such application violates a clear statement requirement of the North American Free Trade Agreement ("NAFTA") Implementation Act under which any amendment to title VII of the Tariff Act "shall apply to goods from a NAFTA country only to the extent specified in the amendment." 19 U.S.C. § 3438 (2000). In April 2006, the court held that "Customs has violated U.S. law, specifically a provision of the NAFTA Implementation Act in applying the Byrd Amendment to antidumping and countervailing duties on goods from Canada and Mexico, 19 U.S.C. § 3438." *Canadian Lumber Trade Alliance v. United States*, 425 F. Supp. 2d 1321, 1326 (Ct. Int'l Trade 2006).[2] We understand that the Canadian Producers also have challenged before a NAFTA arbitration panel the authority of the United States to collect the antidumping and countervailing duties to which the Byrd Amendment applies.

The settlement that the United States, through the Trade Representative ("USTR"), has negotiated with Canada would, among other things, terminate numerous suits in various forums regarding trade in softwood lumber products. *See generally* Draft Softwood Lumber Agreement Between the Government of Canada and the Government of the United States of America (Aug. 1, 2006) ("Settlement Agreement" or "Agreement"). The Settlement Agreement would enter into force only if the parties to the disputes identified in the Agreement execute a "Termination of Litigation Agreement," which is "a full and complete settlement of the issues raised by all of the parties." Settlement Agreement art. II; *id*. annex 2A. In addition, although the *Canadian Lumber* suit would not be terminated, the Settlement Agreement would terminate the application of the Byrd Amendment to duties involving softwood lumber products from Canada, by having the United States agree to revoke the applicable antidumping and countervailing duty orders. The United States would refund to certain "Importers of Record" (the vast majority of whom are Canadian Producers) or to their designees the funds concerning such products held in special accounts (approximately $5 billion). *Id*. art. III. According to the Agreement, most of the Importers of Record are expected to enter into escrow arrangements with the Government of Canada or its agent to sell their rights to the refunds and accrued interest to Canada in exchange for an immediate lump sum payment from Canada equal to approximately 80% of the deposits and interest. An additional $1 billion (approximately equal to the remaining 20% of the refunds) would be distributed, via the Government of Canada or its agent, to three escrow accounts identified by the United States, "whose beneficiaries are respectively": (1) "members of the Coalition for Fair Lumber Imports," (2) "a binational industry council" whose creation Canada and

---

[2] The court also dismissed for lack of standing the Government of Canada, which had joined the Canadian Producers as a plaintiff. *See Canadian Lumber*, 425 F. Supp. 2d at 1349–52.

the United States would encourage, and (3) "meritorious initiatives in the United States identified by the United States in consultation with Canada as described in Article XIII(A)." From that $1 billion, Canada would "distribute . . . $US 450 million for the meritorious initiatives account." *Id.* annex 2C; *see also id.* art. XIII (discussing the council and the meritorious initiatives) & annex 13.

Your question involves this "meritorious initiatives account." The Settlement Agreement generally describes as follows the uses to which the $450 million shall be put:

> The funds shall support meritorious initiatives in the United States related to:
>
> (a) educational and charitable causes in timber-reliant communities;
>
> (b) low-income housing and disaster relief; or
>
> (c) educational and public-interest projects addressing: (i) forest management issues that affect timber-reliant communities; or (ii) the sustainability of forests as sources of building materials, wildlife habitat, bio-energy, recreation, and other values.

*Id.* art. XIII(A)(2). Article XIII further provides that "[b]y September 1, 2006, the United States, in consultation with Canada, shall identify the meritorious initiatives to receive the funds that are to be set aside for that purpose under Annex 2C." *Id.*; *see also id.* annex 2C ("meritorious initiatives in the United States" are to be "identified by the United States in consultation with Canada as described in Article XIII(A)").

Your office has explained that the "beneficiary" of the third escrow account is not precisely "meritorious initiatives" themselves but rather a foundation that will control the "meritorious initiatives account" receiving the $450 million. The foundation will distribute these funds consistent with the three categories listed in Article XIII(A)(2).

The Settlement Agreement is silent on how the United States will identify this foundation, except to state the date—September 1—by which it should be done. Even if a later date is used in the final version of the Agreement, you expect that the deadline for identifying the foundation will predate the effective date of the Agreement, although identification of the foundation is not a condition for the Agreement to enter into force. *See* Settlement Agreement art. II. Beyond that, your office has explained to us as follows how the United States plans to proceed:

> Th[e] foundation will be established in accordance with the terms of the settlement agreement by a board of directors of non-government employees (which will include two non-voting Canadian board

members). Those directors will also control the foundation once it is established.

> The directors will be chosen by a bi-partisan group of non-government employees who are identified by USTR after consultation with the Presidential Personnel Office and with interested members of Congress. Neither the bi-partisan group nor the board members selected by this bi-partisan group will receive government appointments. Neither will they be subject to direction and control by any federal official. Although the bi-partisan group will be vetted by the Presidential Personnel Office, the board members selected by this bi-partisan group will not . . . themselves be vetted by the White House or by . . . any government agency.

E-mail for C. Kevin Marshall, Deputy Assistant Attorney General, Office of Legal Counsel, from David Apol, Office of the General Counsel, United States Trade Representative (July 28, 2006). You have since informed us that the White House Council on Environmental Quality ("CEQ") has been working with USTR in choosing the bipartisan group. Apart from the requirements quoted above—that the directors be "non-government employees," receive no "government appointments," and not be "subject to direction and control by any federal official"; and that the choice of directors not be vetted by any government agency, including the White House—there will be no restrictions on whom the bipartisan group may select as directors. You have asked whether the establishment of this foundation, and the foundation's using its portion of the settlement funds to support "meritorious initiatives," are consistent with the Government Corporation Control Act and the Miscellaneous Receipts Act. We address each statute in turn.

## II.

The Government Corporation Control Act ("GCCA") provides in relevant part that "[a]n agency may establish or acquire a corporation to act as an agency only by or under a law of the United States specifically authorizing the action." 31 U.S.C. § 9102. We assume that the foundation will be "a corporation." But based on the facts described above, we conclude that it will almost certainly not be "establish[ed] or acquire[d]" by an agency; and that, even it if were, the foundation clearly will not "act as an agency." Accordingly, the GCCA does not require a specific authorizing law.[3]

---

[3] Neither the "bi-partisan group of non-government employees . . . identified by USTR" to choose the foundation's board of directors nor the directors themselves would be subject to the conflict of interest restrictions applicable to officers and employees in the Executive Branch. In a 2002 opinion, we summarized those laws and rules and explained that, to be subject to them, a person must be "required by law to be appointed in the civil service by [the President, a court of the United States, the

In answering this question, we rely on our extensive analysis of the GCCA in a published opinion in 2000, which in turn followed earlier, unpublished analyses from 1995 and 1990. *See Applicability of Government Corporation Control Act to "Gain Sharing Benefit" Agreement*, 24 Op. O.L.C. 212 (2000) ("NASA Opinion"); *see also id*. at 214 n.1 (discussing earlier opinions). With regard to the phrase "establish or acquire," we there explained that "an agency probably cannot be said, within the meaning of the [GCCA], to have established or acquired a corporation to act as an agency unless the government *holds an ownership interest or exercises legal control*." *Id*. at 215 (emphasis added; internal quotation marks omitted). We treated this rule as conclusive for the question of "acquir[ing]" a corporation, but recognized that the term "establish" was somewhat ambiguous, particularly given that, prior to a recodification, the statute had referred to establishing, creating, or organizing a corporation. *Id*. at 216 n.2. We therefore further advised that, "even where there is no such ownership or control[,] an agency should *avoid excessive government involvement* in the formation or operation of a corporation in the absence of a law authorizing the agency to do so." *Id*. at 215 (emphasis added). An agency could "*encourage* private parties to form a corporation" and "*make suggestions* about the substance of the corporate charter or by-laws," *id.* (emphases added), but should leave the corporation "free to adopt and change its charter and by-laws to the same extent as any other non-government corporation," *id.* (internal quotation marks omitted).

Applying these standards, we concluded that the National Aeronautics and Space Administration had not "acquired" a particular corporation because it "does not own stock or any other equity interest and, to our knowledge, has no representative on the corporation's Board of Directors." A mere "contractual right" of NASA "to cash payments that are determined by reference to the value of the corporation's stock"—the gain-sharing benefit in question—did not create ownership or legal control. With regard to "establish," we concluded that NASA was not "excessively" involved in the formation and operation of the corporation because the corporation was "created by private investors who have no direct or

---

head of an Executive agency, or the Secretary of a military department] acting in an official capacity" or "appointed in the civil service by one of [a larger category of officials] acting in an official capacity"; (2) "engaged in the performance of a Federal function under authority of law or an Executive act"; and (3) "subject to the supervision" of a federal official. *Application of Conflict of Interest Rules to Appointees Who Have Not Begun Service*, 26 Op. O.L.C. 32, 33 (2002). The bipartisan group would, at least, probably not satisfy the first element, and would certainly not satisfy the third. Regarding the third, we have explained that "a person . . . hired to conduct a study using his own judgment and resources and then turn over the end product to the agency . . . would probably be regarded as an independent contractor" rather than an employee. *Conflict of Interest—Status of an Informal Presidential Advisor as a "Special Government Employee,"* 1 Op. O.L.C. 20, 21 (1977). The bipartisan group, even if it might be understood to be "turn[ing] over" to USTR its "end product" of a board of directors (a debatable proposition), would be using its own judgment and resources. Similarly, the directors themselves would, at least, not meet the first and third elements of the test set out in the 2002 opinion.

indirect association with NASA"; it "was formed without any support or encouragement from NASA"; it "adopted its by-laws and charter without any input from NASA"; and it "remains free to make its own business decisions and to change its by-laws and charter as appropriate without interference or approval by NASA." There was no "evidence of any government involvement in the company's formation or operation," even though NASA and the corporation had collaborated since the corporation's formation and the corporation depended on that collaboration. We specifically reaffirmed the permissibility of "joint activities with private corporations" by agencies, "so long as the agency acts exclusively in the interest of the United States." *Id.* at 216.

A similar analysis applies here and should lead to the same conclusions, even though the federal government will have some role in the foundation's formation. As you have explained the process, neither USTR nor any other entity of the federal government will hold an ownership interest in or exercise legal control over the foundation. No governmental entity or official will own any stock or equity interest in the foundation. Nor is the involvement of the United States in the foundation's formation "excessive." Although USTR (and CEQ) are arguably more involved initially in the foundation's creation than NASA was with the corporation in our NASA Opinion, their role is limited to choosing the bipartisan group that will in turn select the foundation's board of directors. They will have no control over whom the bipartisan group selects and no control over the directors once the group has selected them; the bipartisan group even would be free to select themselves as the initial directors so long as the group in fact made this decision independently of any governmental direction (whether from USTR, CEQ, or others)—such that the United States could not be said to have named the directors and thereby itself organized the foundation. Finally, under our NASA Opinion governmental involvement in not only the "formation" but also the "operation" of a corporation is relevant, and here the directors in operating the foundation would remain free to adopt and change the foundation's charter and by-laws (including revising the board itself) to the same extent as any other non-government corporation and to make its own business decisions. Based on these facts, USTR's involvement should be understood as encouraging the formation of the corporation through selection of the bipartisan group. As indicated in the NASA Opinion, we have approved at least this much involvement. The role of the Presidential Personnel Office in consulting on the selection of the bipartisan group is even more distant and does not raise any additional issue.

Although we thus think that the better view is that no agency will "establish or acquire" the contemplated foundation, we need not answer that question definitively here, because the foundation clearly will not "act as an agency." This is a separate, additional requirement (albeit one that is related and somewhat overlapping analytically) for the GCCA to apply, and it is not met here. Again we follow our NASA Opinion, as well as a subsequent analysis that reaffirmed this aspect of

the NASA Opinion. *See Status of National Veterans Business Development Corporation*, 28 Op. O.L.C. 70, 76–78 (2004) ("NVBDC Opinion").

The term "agency" for purposes of title 31, of which the GCCA is a part, is defined as "a department, agency, or instrumentality of the United States Government." 31 U.S.C. § 101 (2000). In our NASA Opinion, we explained: "In common usage, an instrumentality is a thing through which a person or entity acts. The term implies both [1] that the thing is *controlled* by another actor and [2] that the thing is or may be deliberately *used* to accomplish the actor's objectives." 24 Op. O.L.C. at 218–19 (emphases added; internal quotation marks omitted). Based on this understanding, as well as the usage of the term "instrumentality" in other legal contexts, we have used a four-factor test "in deciding whether a corporation is a government instrumentality": (1) "whether the entity was created by the government"; (2) "the extent of government control over its operations"; (3) "the purposes for which it was created and the functions it performs"; and (4) "the source of the entity's funding." *Id*. at 219. The final factor "is more important here than it might be in other contexts," because "the purpose of the [GCCA] was to assert greater federal dominion over the financial affairs of entities controlling federal funds." *Id*. at 219 n.4 (internal quotation marks omitted). *See also* NVBDC Opinion, 28 Op. O.L.C. at 76–77 (reiterating and applying four-factor test to the first use of the term "agency" in the GCCA).

In the NASA Opinion, we concluded that the corporation in question did not "act as an agency" because (1) it was "created by private individuals who are not associated with NASA"; (2) "NASA owns no part of [the corporation] and exercises no control over its operations"; (3) the corporation "was not formed for NASA's exclusive benefit, nor to carry out any statutory function delegated to the agency by Congress"; and (4) the corporation "is funded by private sources, not funds drawn from the federal Treasury or other federal assets." 24 Op. O.L.C. at 220–21. By contrast, in our NVBDC Opinion, we determined that the National Veterans Business Development Corporation was an "agency," and thus subject to the GCCA, because it (1) was "created by the government" (namely, by statute); (2) was subject to "a considerable degree of control" by the government (the voting members of its board being appointed by the President and the non-voting members being Executive Branch officers); (3) was established "to perform functions on behalf and for the benefit of the United States" (providing various statutorily mandated services to veterans); and (4) "receives federal appropriations, even as it seeks to develop private sources of funds." 28 Op. O.L.C. at 77–78 (quotations omitted).

Under that analysis, it is clear that the foundation will not "act as an agency" within the meaning of the GCCA. First, largely for the reasons given above with regard to the question of acquiring or establishing a corporation, the foundation is not going to be "created by the government." Unlike with the NVBD Corporation, the foundation is not being created by statute (or even by the Settlement Agree-

ment). In the NASA Opinion, we found the first factor not satisfied because the corporation "was created by private individuals who are not associated with NASA," even though it was "formed in response to NASA's published notice of its intent to enter collaborative . . . commercial agreements with private business partners." 24 Op. O.L.C. at 220. Similarly, here, as described above in Part I, the bipartisan group that selects the foundation's directors will be "non-government employees"; neither the group nor the directors "will receive government appointments"; "neither will they be subject to direction and control by any federal official"; and the choice of directors will not be vetted by any federal entity. You have not expressly stated that the directors too will be non-government employees, but that is implicit in their receiving no government appointments, not being subject to federal direction or control, and not being vetted. Although, much as with the corporation at issue in the NASA Opinion, the foundation would not be formed but for some governmental action, and the government could prevent its creation by not proceeding with the settlement (as could Canada and others), "but for" governmental involvement does not equal *creation by* the government.

Second, for the reasons discussed above with regard to ownership, legal control, and involvement in operations, the extent of any governmental control over the foundation's operations after its establishment appears negligible at most.

Third, the purpose of the foundation is not to perform functions on behalf of and for the benefit of the United States. In contrast with the NVBD Corporation, here no statutory mandate or purpose is at issue. In the NASA Opinion, even though NASA would benefit from the collaborative agreement with the corporation, we found this factor not satisfied because the corporation was "not formed for NASA's exclusive benefit, nor to carry out any statutory function delegated to the agency by Congress." 24 Op. O.L.C. at 221. Similarly here, the foundation's purpose is to receive funds over which the United States disclaims any ownership interest (because of the Byrd Amendment) and to disburse these funds for the benefit of private entities. The United States may indirectly benefit only because the foundation's establishment provides one of the many pieces of a comprehensive settlement in which it has an interest, but this incidental benefit—which also accrues to Canada and all of the other entities who settle their suits as part of the Agreement—does not amount to a governmental function or purpose.

Finally, although the proper way to characterize the source of the foundation's funding is not beyond dispute—the ownership of those funds is one of the matters to be resolved—for purposes here it is best characterized as funding from private entities, not the United States. The United States has never asserted a claim to the $450 million held in the special accounts that will eventually reach the foundation, and the immediate source from which the foundation will receive those funds will not be the United States but rather the Government of Canada, as explained above in Part I. In addition, and in contrast to the NVBD Corporation, the foundation will receive no appropriated funds. The one countervailing fact is the decision of the

Court of International Trade in *Canadian Lumber*, which could lead to the duties held pursuant to the Byrd Amendment reverting to the General Fund of the Treasury. Thus, one could say that, in some sense, the United States has a claim on the money that will fund the foundation. But the United States disagrees with this view, and thus disclaims any interest in the funds; in addition, pursuant to the NAFTA arbitration noted above in Part I, there also is a question whether the United States had authority even to collect the duties, and we understand that the United States foresees a low probability of success in that forum. In nearly every respect, the strongest claims to the money in the special accounts are those of private parties—either the Canadian exporters or the domestic producers. Under those facts, there is little if any basis for considering the $450 million to be "federal funds," *see* NASA Opinion, 24 Op. O.L.C. at 219–20 & n.4, for purposes of the GCCA.

Thus, not only is the foundation not being acquired or established by the federal government, but it also will not be acting as an agency of the federal government. For both of these reasons, the foundation is not subject to the GCCA.

### III.

The Miscellaneous Receipts Act ("MRA") requires that "an official or agent of the Government receiving money for the Government from any source shall deposit the money in the Treasury as soon as practicable without deduction for any charge or claim." 31 U.S.C. § 3302(b). This provision constrains the government's ability to enter into settlements involving payments not made into the General Fund of the Treasury. In 1980, we said that it would violate the MRA for the United States to settle a suit it had brought against a polluter by requiring the polluter to donate money to an environmental organization designated by the government, rather than pay a penalty. Under the MRA, "[t]he fact that no cash actually touches the palm of a federal official is irrelevant . . . if a federal agency [1] could have accepted possession and [2] retains discretion to direct the use of the money." *Effect of 31 U.S.C. § 484 on the Settlement Authority of the Attorney General*, 4B Op. O.L.C. 684, 688 (1980).

To avoid the government's constructively "receiving money for the Government" through a settlement, we have consistently advised that (1) the settlement be executed before an admission or finding of liability in favor of the United States; and (2) the United States not retain post-settlement control over the disposition or management of the funds or any projects carried out under the settlement, except for ensuring that the parties comply with the settlement. *See, e.g.*, Memorandum for the Files, from Rebecca Arbogast, Attorney-Adviser, Office of Legal Counsel, *Miscellaneous Receipts Act and Criminal Settlements* (Nov. 18, 1996) (advice transmitted to U.S. Attorneys' offices). If these two criteria are met, then the governmental control over settlement funds is so attenuated that the government cannot be said to be "receiving money for the Government." In our 1980 opinion,

for example, we recommended a restructured settlement "that attributes the entire sum of money received to our co-plaintiff, the Commonwealth of Virginia," which had "an independent claim to these damages" and an independent right to compensation for oil spills. "If the damages are received and directed to a charity by the state plaintiff, [the MRA] would not be implicated." 4B Op. O.L.C. at 688–89.

In the ordinary settlement implicating the MRA, the United States has brought a claim against a private party for funds in the form of damages or penalties. Here the reverse is the case. Although the same general principles under the MRA apply notwithstanding this difference, we find no violation in the planned arrangement for the foundation.

Initially, it is doubtful that the United States, even though having physical custody of the special accounts under the Byrd Amendment, "could . . . accept[] possession" of those funds "for the Government," such that the MRA would create an issue. As explained above in Part II, the United States disclaims any interest in the funds, and the strongest claims are those of private parties. The real issue in dispute is to whom the United States should give the funds—to private American parties pursuant to the Byrd Amendment, or to the Canadian Producers as a refund pursuant to federal law, *see, e.g.*, 19 U.S.C. § 1673f (2000) (permitting the "refund[s]" of duties that were improperly assessed). Just as there is little if any basis for considering the $450 million to be federal funds for purposes of the GCCA, so also here, and by analogy to our 1980 opinion, there is little basis for attributing any of the $450 million to the United States. Nevertheless, because it is conceivable—if the Court of International Trade decision is not appealed or is affirmed, and the United States wins the NAFTA arbitration—that the special account funds could become United States funds, it is prudent, as you have recognized, to analyze under the MRA's requirements the provisions for the $450 million pursuant to the Agreement.

Here, the arrangement for the foundation and the transfer of the $450 million would easily satisfy both of the MRA's requirements. First, we understand that the Settlement Agreement would be executed before any party admits liability—and certainly before the United States claims or is conceded any right to the funds. Second, no governmental agency will exercise any control of the funds after the settlement has been executed, because the foundation and any further detail regarding "meritorious initiatives" will be "identified" by the United States prior to execution, as we explained above in Part I (in light of the MRA, you should ensure that this occurs); the foundation's directors will control the foundation; and the directors will not be subject to direction and control by any federal official.

A separate but related question is the relevance of decisions of the Comptroller General determining that agencies did not have authority to require violators owing penalties to the Government to fund research projects in lieu of paying the penalties into the Treasury. *See* Letter for John D. Dingell, Chairman, Subcommittee on Oversight and Investigations, Committee on Energy and Commerce, House

of Representatives, B-247155.2, 1993 WL 798227 (Comp. Gen. Mar. 1); Letter for John D. Dingell, Chairman, Subcommittee on Oversight and Investigations, Committee on Energy and Commerce, House of Representatives, B-247155, 1992 WL 726317 (Comp. Gen. Jul. 7); *Nuclear Regulatory Commission's Authority to Mitigate Civil Penalties*, 70 Comp. Gen. 17 (1990) ("NRC Opinion"). In those decisions, the Comptroller General read the agency's statutory authority to "compromise" or "mitigate" monetary penalties owed to a governmental agency as "not empower[ing] [the agency] to impose punishments unrelated to prosecutorial objectives," such as "contribut[ing] funds to an institution that . . . has no relationship to the violation and has suffered no injury from the violation." *E.g.*, NRC Opinion, 70 Comp. Gen. at 19. A broader interpretation, he explained, would permit the agencies to augment their appropriations by funding pet projects, and would therefore "require us to infer that the Congress intended to allow [the agencies] to circumvent 31 U.S.C. § 3302 and the general rule against augmentation of appropriations." *Id.*

These decisions are inapposite here. First, given the posture of the suits to be settled—involving the atypical scenario of the United States being a defendant and acting pursuant to longstanding refund authority regarding customs duties—there is no issue here of the scope of the authority of the United States to "compromise" or "mitigate" civil penalties. Second, the MRA does not apply here, for the reasons given above. There is thus no issue of a possible statutory exception to the MRA.

C. KEVIN MARSHALL
*Deputy Assistant Attorney General*
*Office of Legal Counsel*